810 A.2d 1152 (2002)
355 N.J. Super. 556
STATE of New Jersey, Plaintiff-Respondent,
v.
Armando NEGRON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted October 2, 2002.
Decided December 11, 2002.
*1153 Yvonne Smith Segars, Public Defender, for appellant (Jacqueline E. Turner, Assistant Deputy Public Defender, of counsel and on the brief).
Peter C. Harvey, Acting Attorney General, for respondent (Jeanne Screen, Deputy Attorney General, of counsel and on the brief).
Before Judges KESTIN, FALL and WEISSBARD.
The opinion of the court was delivered by KESTIN, P.J.A.D.
Defendant, Armando Negron, was convicted by a jury of murder, N.J.S.A. 2C:11-3a(1), (2), and possession of a weapon for unlawful purpose, N.J.S.A. 2C:39-4a. These convictions occurred in a second trial after the jury in an initial trial was unable to reach a verdict. On sentencing, *1154 the trial court merged the convictions and imposed a prison term of seventy-five years subject to the provisions of N.J.S.A. 2C:43-7.2, requiring service of eighty-five per cent of the term before defendant would be eligible for parole and subjecting him to five years of parole supervision upon release. Appropriate provision was made for the imposition of statutory assessments, penalties and fees, and of other conditions. On appeal, defendant raises the following issues:
POINT I BECAUSE THERE WAS INSUFFICIENT EVIDENCE PRESENTED TO PROVE THAT ARMANDO NEGRON KILLED LAZARA CUNHA, THE DEFENSE MOTION FOR A JUDGMENT OF ACQUITTAL SHOULD HAVE BEEN GRANTED.
POINT II THE TRIAL JUDGE ERRED IN REFUSING TO GRANT THE DEFENSE REQUEST FOR A MISTRIAL AFTER THE PROSECUTOR REPEATEDLY DISPARAGED DEFENSE COUNSEL AND THE EXPERT WITNESSES WHO TESTIFIED.
POINT III THE DEFENDANT'S SENTENCE IS EXCESSIVE.
We reverse on the basis that defendant was denied a fair trial by the prosecutor's conduct of the State's case.
The victim, Lazara Cunha, was murdered on August 12, 1998. Defendant and Cunha worked in the same office in New Brunswick. They had been friends for several years and often lunched together. Cunha was in her fifties and was married. Defendant was in his thirties and was single.
A number of their co-workers testified at trial concerning the relationship. According to one, because of the difference in their ages Cunha had taken defendant "under her wing" and they seemed to have "a mother/son relationship." Another co-worker testified that defendant had expressed a sexual interest in Cunha. A third co-worker testified that defendant had stated that Cunha had been making advances toward him. Some co-workers stated that, in the months before the murder, Cunha's relationship with defendant changedthey were no longer close and Cunha seemed to distance herself from defendant.
On the day of her death, at about 8:30 a.m., Cunha, appearing upset, told a fellow employee that she was going to follow defendant to a gas station to leave his car for repairs and drive him back to work. Defendant had been seen by other employees before 8:00 a.m. sitting in his car in the office parking lot. Another employee saw Cunha's beige Jaguar leave the parking lot just after 8:30. At about the same time, two other fellow employees on their way to work saw defendant pacing on the pavement near an intersection down the street from their place of employment, with his car, a red Suzuki, nearby. Defendant declined their offer of assistance.
A few minutes later, a driver passing by saw a woman seated behind the wheel of a Jaguar. Her head was moving and she was apparently conversing with a man standing at the driver's-side window. A few minutes after that, other witnesses saw a man, later identified as defendant, looking into a gold Jaguar parked at the curb in the same location, and then returning to a red car parked nearby. One of those witnesses testified that she first saw defendant looking into the driver's side of the Jaguar, running to the front of the car and looking inside through the windshield, and returning to his position at the driver's-side window. Then, he ran to a red jeep-type vehicle parked in a driveway and entered it. That witness described defendant as running the entire time, as if panicked or in a rush. Two *1155 other witnesses saw the Jaguar moving erratically, slowly gliding and then coming to a stop near the driveway. One of them testified that the Jaguar's emergency flashers were lit. Photographs later taken at the scene by the police showed the Jaguar squarely parked at the curb.
A few minutes later, Cunha was discovered by a passerby, sitting in the driver's seat of the Jaguar, wearing her seatbelt and slumped over the steering wheel. The Jaguar's engine was running, its right blinker was on, and Cunha was bleeding profusely from facial injuries.
The police were summoned. They determined that Cunha had been shot in the head and was dead. It appeared that no robbery had occurred, as none of her belongings were disturbed.
When immediate investigation disclosed that Cunha had left work to meet defendant at the gas station, the police went to his home in Newark. He was not there, but his car was located at his sister's home at another Newark address.
The day following, defendant called his sister from Toledo, Ohio. A week later he surrendered to the police at Newark Airport after disembarking from a flight from Puerto Rico.
Although many witnesses testified to the circumstances surrounding Cunha's murder and facts bearing upon her relationship with defendant, some placing defendant in the vicinity of Cunha's vehicle at around the time of her death, there were no witnesses to the actual homicide and none had heard a gunshot. With the exception of a single character witness, defendant presented no fact witnesses. The State's theory was that defendant, spurned by Cunha, had shot her while standing beside her car. Defendant's theory was that Cunha had been shot by someone else while driving and was discovered by defendant in her injured condition. Expert witnesses on behalf of the State and
defendant provided conflicting hypotheses supporting the respective theories of the case based on scientific analyses regarding the circumstances of the death. The focus of much of that testimony was whether Cunha could have been shot before her vehicle came to rest where found.
The State's medical expert was the State Medical Examiner, Dr. Faruk Presswalla, a forensic pathologist with extensive experience in that field. Dr. Presswalla testified that the cause of death was a gunshot wound to the left side of Cunha's head above and behind the ear, which traveled toward the right in a downward direction, entering the skull and penetrating the brain, shattering the brain stem and fracturing the base of the skull, and lodging under the skin of the right cheek from where it was recovered. According to Dr. Presswalla, the brain stem injury immediately rendered Cunha unconscious with no ability for voluntary movement or motor function beyond small involuntary twitches. He concluded that the shot came from outside the driver's-side window, which was either partially or completely open since the bullet did not go through the glass. Gunpowder residue and particle lead found on Cunha's shirt indicated that the shot had been fired at an intermediate range, from a distance of about three feet.
Dr. Abbott Krieger, a professor and neurosurgeon with extensive practice and research experience in brain injuries, testified as a medical expert for the defense. In support of the thesis that Cunha had already been injured when defendant was seen at the side of her car, he opined that Cunha had been shot while operating her car causing her to drive erratically. He stated that a person who was severely brain injured and unconscious could move his or her arms and legs and even turn his or her head in reflexive motion.
*1156 Another defense expert, Dr. Ira Kuperstein, a forensic engineer, provided supporting opinion for the thesis that Cunha could have driven after having been shot. Based on the location of one of the State's witnesses, Dr. Kuperstein also questioned the ability of that witness to have discerned some of the detail provided in his testimony.
Because no one had witnessed the actual homicide and because there was no direct scientific evidence connecting defendant to the crime, the jury was left with the task of determining whether the circumstances established were an adequate basis for finding beyond a reasonable doubt that defendant had murdered the victim. In the face of the testimony placing him at the scene around the time of Cunha's death and providing some evidence of motive, defendant had offered his theory that Cunha had been shot by someone else while driving and that her vehicle had come to rest at the location where defendant had parked his car. Despite testimony that tended to establish that Cunha had intended to follow defendant from their office's parking lot to a nearby service station, no one saw them leave the parking lot together. Indeed, although one witness placed defendant in his car in the parking lot before 8:30 a.m., others saw him alone shortly after 8:30 a.m. at the location where Cunha's body was found. Thus, there was some basis in the evidence for the jury to conclude that Cunha had driven to that location while defendant waited there, and to use that inference to support either the State's theory or defendant's.
Accordingly, the conflicting testimony of the respective experts, especially the medical experts, became a critical element in the case. If the jury accepted Dr. Presswalla's opinion that Cunha was incapable of propelling her car from the roadway to the curb once shot, it might well conclude that she had pulled the car to the curb before being injured and that defendant had shot her. If, on the other hand, Dr. Krieger's contrary opinionas fortified by Dr. Kuperstein's physical depictionsregarding the decedent's physical capacities after sustaining the wound inflicted were to be accepted, the jury might well be inclined to find reasonable doubt regarding defendant's guilt. If the choice were to be seen as close, the trial might have as unsatisfactory a result as had occurred in the previous trial of the same charges, where the jury was unable to reach a unanimous verdict.
In this context, the prosecutor embarked on a conceptually allowable effort to discredit both the credibility of defendant's experts as well as the substance of their testimony. He did so, however, in ways that exceeded the bounds of fairness, with the result that the trial was infected with the same shortcomings as were found to have existed in State v. Smith, 167 N.J. 158, 770 A.2d 255 (2001).
We set aside numerous instances of quibbling, argumentation, baiting and contentiousness in the prosecutor's cross-examination of Dr. Krieger, some of which earned the prosecutor well-deserved censure by the trial judge. We concentrate primarily upon the instances of Smith-type prosecutorial excess and other similar tactics which the testimonial record reveals.
They began with a focus on several malpractice cases in which Dr. Krieger had been one defendant and which had resulted in sizeable settlements for the claimants. The prosecutor referred to the fact that Krieger was licensed in several states and had been chief of neurosurgery in several different hospitals, inquiring: "You wouldn't be jumping around from state to state and hospital to hospital because of all the mistakes you've been making, right?" The witness responded that his presence *1157 in New Jersey for twenty-five years was not jumping around.
Then, after summarizing the different theories propounded by Drs. Presswalla and Krieger, the prosecutor turned to concentrate on the fee charged by Krieger for his services as an expert. The trial transcript reveals the following:
Q Doctor, let's get to the real difference between you and Presswalla, okay?
A I thought that was the real difference.
Q What's your standard fee for testifying as an expert witness?
A Sixty-five hundred dollars.
Q If I told you Dr. Presswalla doesn't get paid to testify, certainly not $6500 a shot, would you disagree with me?
A I don't know what he's getting paid.
Q He's employed by the State as the Chief Medical Examiner for the State.
[DEFENSE COUNSEL]: That's inaccurate.
THE COURT: That's not a question first of all. It's testimony.
[DEFENSE COUNSEL]: He does get paid out of State. [sic] It's inaccurate.
THE COURT: The objection is sustained. Don't argue with the witness and don't make comment. Ask questions.
Q What's your standard fee?
A My standard fee is $6500.
Q And that's to put together like you did in this case a three-page report and come in here and share your views for a couple hours and then go home, correct?
A No, that's not correct. It's really
Q In this case
THE COURT: Let him finish his answer.
A (Continuing) I'm reviewing all the medical records provided to me, having several conferences with [defense counsel], appearing in court, freeing up my time to be here. In fact, in this trial I'm not charging my standard fee.
Q You're cutting it down?
A I'm charging less.
Q Because things are tough with you. Because your medical malpractice keeps going up every time you screw up, isn't that right?
A No. The reason why
[DEFENSE COUNSEL]: Objection, judge. There's no foundation for that question.
THE COURT: Objection sustained.
THE WITNESS: Can I answer the question?
THE COURT: I'm going to let you answer the question after I give counsel an instruction.
One, let the witness finish the answers. I understand you have a number of questions. I understand this is vigorous cross examination. I have no problem with that. You must let the witness answer the question before you begin your next question; and don't argue with the witness. Go ahead.
[THE PROSECUTOR]: I would then ask you to instruct the witness to answer my question. I would ask you to instruct the witness to answer my question and not lecture on tangencies.
THE COURT: When that occurs I will.
Go ahead, you can answer.
A The reason I was willing to testify for less than half my fee is because I felt so strongly that the understanding of the physiology was being completely misstated and I really felt an obligation, a civic obligation, to come in here and to explain to the jury what happens physiologically so that when they make their decision at least they'll make it on the basis of all the information and understanding what the physiological disruptions *1158 of the brain do in terms of clinical functioning. I wanted to make that very clear and explain it and that's why I'm here.
Q You know that's not true because you know you could not get your standard fee. It was reduced for reasons known to you, me, and [defense counsel].
A And I could have walked away.
THE COURT: Wait a minute. That's not a question.
Ladies and gentlemen, there's no evidence before you that there was a reduction in the witness' fee for any reason whatsoever. It's simply not before you. That's a gratuitous statement. It's one of those gratuitous statements I've been referring to during the entire course of this trial and you are to disregard it.
[THE PROSECUTOR]: Judge, are you aware of how this witness is being paid?
THE COURT: You are not asking questions of me. You're posing questions to the witness. Would you like me to address that with you at side bar?
[THE PROSECUTOR]: Yes, I would.
THE COURT: Come on.
(The following is a discussion at side bar:)
THE COURT: There is no evidence before this jury by a witness as to what reductions, if any, occur in the payment of this witness. You are not a witness. You're not permitted to testify. I'm sick of these gratuitous statements. Do you understand?
[THE PROSECUTOR]: Yes, but let me explain.
THE COURT: Let's go back on the record.
[THE PROSECUTOR]: I need to make a record.
THE COURT: Let's go.
(End of discussion at side bar.)
Q Your bill in this case was scrutinized, was it not?
A I don't know.
Q You haven't submitted it yet?
A No.
Q Twenty-nine hundred dollars for your civic duty, that's what it's worth?
A That's what I am going to submit for my bill.
THE COURT: I didn't hear the end of the answer.
That's what you're going to submit to ...
THE WITNESS: For my bill.
Q You had to stumble on that. It probably hurts you to have to charge so low, correct?
A You're making me nervous. That's why I'm stumbling. I came here
Q Sixty, 50, you've testified however many times as an expert, correct?
A That's right.
Q This is not the first time you're on the stand, correct?
A Well, I have
Q Correct? That calls for a yes or no.
THE COURT: Can you answer the question with a yes or no?
THE WITNESS: No. I have to explain it.
[THE PROSECUTOR]: That this is not his first time on the stand.
THE COURT: He says he can't answer it with a yes or no answer. That's his answer.
[THE PROSECUTOR]: I'll withdraw the question. We'll move on.
Q What makes you nervous, doctor, is that you are distorting the facts in this case to come up with your silly opinion, isn't that what makes you nervous?
A No.
Q Well, I'm going to give you a golden opportunity to explain how it is you think it's reasonable within a medical degree, your opinion....
*1159 Whereupon, the cross-examination continued with inquiry into the bases of Dr. Krieger's opinions.
The prosecutor, gratuitously, continued his attack on Krieger even in beginning his qualifications voir dire cross-examination of Dr. Kuperstein:
Q Unlike Dr. Krieger's[,] your resume is short and sweet?
A Yes. One page.
Q The way it's supposed to be, right?
[DEFENSE COUNSEL]: Objection.
THE COURT: Sustained.
And then, in resuming the delayed continuation of his cross-examination of Dr. Krieger, the prosecutor took another tack in his assault on Krieger for the fact that he was receiving fees for his services as an expert:
Q If I told you [one of the fact witnesses] got zero cents to come in here and testify compared to your $2900 do you think that would make a difference as to whether she was coached or whether she embellished or whether she stretched the truth as you're referring?
A I think that all witnesses come without any compensation.
Q Not you, sir?
A Well, I'm an expert and experts are a different category.
Q I thought you were here for your civic obligation as you testified to. Isn't that what you said?
A Mr. Prosecutor,
Q Mr. Neurosurgeon.
A humiliating me does not change the facts or the medicine. We're talking about the specific cases and you then when you don't like my answers you humiliate me.
Q I don't mean to humiliate you. You're saying this woman put a spin on her testimony, correct?
A Yes, I am. I'm saying it based upon reading the two documents and seeing the refinement of the second testimony compared to the first. That has nothing to do with being paid or not. That has to do with just making that type of observation in terms of what the witness said on two occasions.
Q You're an expert witness and you know things of that sort, is that it?
A Well, I have the benefit of reviewing both sets of testimony.
Q You've also had the benefit of talking to any of the witnesses on the witness list. Did you do that?
A No, I did not.
Q So really you're just passing your judgment on these good people who came in here to testify because in your view there's a refinement in their transcript now, correct?
A I'm just making a comment upon having read both of them and pointing out the differences that are very obvious in both sets of testimonies. That's all I'm doing.
Q Could it be that the questioner was more refined in his questions?
A In some ways you were more refined in your questioning but still the answers were really very, very much more refined and I'm sure if the jury had the opportunity of reading both they would come to the exact level, the same conclusion.
[THE PROSECUTOR]: I would ask you admonish the witness for that comment.
THE COURT: You opened this door.
[THE PROSECUTOR]: No, I didn't.
THE COURT: Yes, you did. You opened the door by asking this witness to characterize another witness' testimony.
[THE PROSECUTOR]: I think he did that all by himself.

*1160 THE COURT: This was absolutely foreseeable.
You want to start and pursue another line of questioning?
The prosecutor's endeavor to impugn the integrity of defendant's experts with undue concentration on the fees they were charging for their services continued in the cross-examination of Dr. Kuperstein. Having established Kuperstein's hourly rate, the prosecutor, after cross-examining him regarding his theories of the case, concluded:
Q It's five minutes to twelve, right?
A Yes.
Q You've been here since nine o'clock?
A I got here a few minutes before nine.
Q Three hours at $325.00 an hour equals almost a thousand dollars for your testimony today, correct?
A No. I charge for my time and it's $3.20 [sic] an hour.
Q So $3.20 times three is $960,00. [sic]
A Correct.
Q Yesterday you were here all day?
A Yes.
Q How many hours is that?
A Eight.
[THE PROSECUTOR]: May I have a black marker?
* * *
Q So yesterday was eight hours
A I'd have to check. It's either eight or nine because I did some preparation. There's travel time.
Q You bill for travel time, of course.
A Yes.
Q Let's take a conservative number, 8. My math is off. $2,560?
A It seems right.
Q For yesterday. You came to Middlesex County four times to look at this car.
A Three of them went to the site and there was another one.
Q We'll talk about the videotape in a minute. Let's talk about the Jaguar. Four times you came into Middlesex County to check this car.
THE COURT: That's a question, doctor.
Q I think we did it three times. I thought you said April.
A The 27th.
Q I thought you said April, May.
A 27th of April, May 19th, and November 22. The 23rd was at
Q Middlesex County. I'm talking at the county. I don't mean to confuse you.
A I was thinking of the college.
Q Three times in Edison, once in New Brunswick.
A And then the videotape
Q We'll get to it. Four times you checked the car out?
A I did different things, yes.
Q The first time you spent what, maybe an hour?
A In total I spent about three days of billable time when you group everything together, up until
Q Prior to court time you're saying it's three billable days?
A About that.
Q That's 24 hours?
A Yes. That's an approximation.
Q Twenty-four times $3.20 [sic] is how much?
A Seventy-five hundred plus one eighty. I can't calculate.
Q Six eighty, right?
A Yes.
Q Now the videotape was probably another two, three hours?
A That's included in the three days.
Q You're going to throw in the $5.00 for the actual cost of the cassette? *1161 A The charge according to my regular fee schedule is $75.00 for each videotape done. It's the cassette, it's duplicating, it's advertising, equipment costs. It's $75.00 for that. It's $4.00 per photograph that I take and there are some photographs you may want to put another hundred dollars for stills and that.
Q Is it fair to say this is all over $10,000?
A I expect that's what the total billing is going to be.
On re-cross-examination, the subject was Dr. Kuperstein's opinions regarding a witness's ability to see the scene from the vantage point claimed. The subject of fees as bearing upon the opinions offered was once again injected by the prosecutor:
Q With respect to [the witness] what you think he could not see based upon your test and your videotape and your ten thousand dollar fee and everything else you've done in this case
[DEFENSE COUNSEL]: I object to it. That's just rude.
THE COURT: It's unnecessary.
[THE PROSECUTOR]: It goes to his credibility.
THE COURT: Objection sustained. Your statement doesn't. He's already testified as to what his fee is. You've drawn a diagram.
Next question. Let's move this along.
These attacks on the credibility of defendant's experts by concentrating on the fees they charged as well as the substance of their testimony continued into the prosecutor's summation. That focus intruded even in the prosecutor's comments upon the testimony of another, lay, witness:
[THE WITNESS] also had a lot to tell us about the attraction and obsession by the defendant. He told you how much the defendant wanted to have sex with her. I guess men use that expression. The defendant had a lot to say to [the witness] about Lazara. He listened to it, testified to it very truthfully. He certainly wasn't paid $10,000 to come in here and testify as to what he observed and heard.
Then the prosecutor began to associate defense counsel with the suggestion that defendant's case including the expert witnesses defendant's only witnesses beyond a single character witnesswas premised on lies.
[THE PROSECUTOR:] ...
[Defense counsel] in one of his many attempts to spin the evidence and misstate the facts told you that [two State's witnesses] said that the defendant was wa[ ]ving.
and then, shortly thereafter:
... [I]t bothers me to hear the defense attorney misstate the facts and the law too. I think when [defense counsel] got before you this morning he was fast and loose with what [a State's witness] said.
You know at first Dr. Krieger didn't even want to acknowledge that the blinker switch was on the left side of the steering column. I showed him the picture and he's like, well, I don't know what this is. Well, when you look at those pictures you'll see for yourself. I guess he got coached a little bit over the next 12 or 24 hours because when he came back on the stand he agreed that the switch was on the left side. He knew that's where we left off and he knew I was going to grill him to death on that point. That turn signal is very important.
The summation attack on the expert witnesses based on their fees accelerated, and the argument that defense counsel had fomented untruth continued, both engendering yet another sidebar conference:
The victim is pulling into the shoulder. The light came on as the victim pulled by the driveway because the victim was *1162 alive when she turned on the switch. All the other motions or actions with respect to stopping that car also indicate Mrs. Cunha was alive. It's almost ludicrous to assume this woman could have been shot up the road and without any evidence whatsoever of a shooter up the road standing along the curb in another car or a gunshot being heard up the road. It's ludicrous to believe that this woman could have come to that scene right by where the defendant was standing.
I wonder if I should even spend as much time negating that claim. There is no evidence to support it. But, you know, twelve of you have to agree on the case in order to find this man guilty. And I need to really eradicate from your mind how this woman could have been shot up the road. It's simply impossible. And with respect to that defense in general let me just tell you right now it's a desperate defense because our case is so good, the State's case is so strong, [defense counsel] has to pay witnesses to come in here to concoct a story in order to distract you from the proofs. If you don't believe the defense in this case there's simply just one option. That's to find this defendant guilty because he's the only person at the scene who could have shot the victim. He's the only one who fled from the scene. By the way, [defense counsel] doesn't say anything about that in his summation.
[DEFENSE COUNSEL]: Can I see you at side bar, judge?
THE COURT: Yes.
(The following is a discussion at side bar:)
[DEFENSE COUNSEL]: I paid no fact witnesses. I paid no one to concoct a story. Expert witnesses as they always are are compensated for their testimony. But to leave the impression that I concocted a story is to say that fact witnesses are somehow paid to give testimony and I believe that impression is wrong to give. I have no problem with my adversary commenting on the fact that expert witness was compensated but an expert witness does not give facts, gives opinions based on the evidence that's already in the case.
THE COURT: Other than?
[DEFENSE COUNSEL]: Paid to concoct a story is what I'm objecting to.
THE COURT: Of the expert witnesses?
[DEFENSE COUNSEL]: The prosecutor said I paid witnesses to concoct a story. There are no fact witnesses that were paid by the defense.
THE COURT: How many fact witnesses did you call?
[DEFENSE COUNSEL]: None. That's my point.
THE COURT: Then you couldn't have paid any.
[DEFENSE COUNSEL]: Right. That's why there's a misleading impression, that I paid people to concoct a story.
THE COURT: So it's the concoction of the story that you are objecting to.
[DEFENSE COUNSEL]: Fact, not opinion.
THE COURT: You called no fact witnesses.
[DEFENSE COUNSEL]: I have not. That's my point.
THE COURT: Other than the fact/character witness.
[DEFENSE COUNSEL]: I called one fact/character witness, that's right.
THE COURT: All right.
[THE PROSECUTOR]: Judge, obviously in the context of my summation I'm referring to the expert witnesses. I'm referring to their testimony. If counsel is trying to split hairs and suggest *1163 that I would have been permitted to say ["]concoct an opinion[",] then I think it's semantics at this point. I did say in a strong attack on experts that they are fabricating their testimony for a fee. That was the basis behind my comment. I think it's permissible.
THE COURT: All right.
What's your application?
[DEFENSE COUNSEL]: That it be stricken and the jury be cautioned, given a cautionary instruction.
[THE PROSECUTOR]: I object to that. I didn't say anything that was improper.
THE COURT: Counsel, there was one fact witness, Lieutenant Velazquez, who was not paid. Certainly your comments were not improper as it relates to experts, Dr. Krieger, Dr. Kuperstein. I don't want the jury left with a misimpression that there was any money paid to Velazquez. With respect to Velazquez I grant the application for an instruction that fact witnessesI'll make the statement generally that fact witnesses are not paid and that their testimony is provided without any formal payment.
[DEFENSE COUNSEL]: I have no objection to that.
(End of discussion at side bar.)
THE COURT: The objection is sustained.
Ladies and gentlemen, fact witnesses are not paid and you should not therefore infer that any fact witness in this case received any compensation because they did not.
The prosecutor persisted:
[THE PROSECUTOR]: I'm very clear about my last statement. I'm referring to the statement [of] two witnesses that [defense counsel] called who he paid to come up with this fabulous opinion of theirs, not Detective Velazquez who offered very little in this case as a fact witness and as a character witness. I'll talk more about that in a minute.
As the summation proceeded, the prosecutor reviewed the testimony of Dr. Presswalla, stressing that he had testified as the State's Chief Medical Examiner with a wealth of experience as a forensic pathologist. The prosecutor then juxtaposed the credentials and experience of Dr. Krieger, turning once again to the fact that he and Dr. Kuperstein had been paid expert witness fees.
This man was a professional witness just like Ira Kuperstein. He came here for one reason and one reason alone. He came here because he was paid. He was paid to testify. (Demonstrating.) The only thing that Dr. Krieger talked to you [about] when he got up on the stand was money. He had the nerve to say I'm not charging my sixty-five hundred dollar fee because I'm here because I think my civic obligation, my civic duty[,] calls me to right the wrongs that Dr. Presswalla made. That's nonsense just like everything else he said. Just like the 90 degrees and parallel lines. All nonsense. About the only thing Dr. Krieger told you that was true was his name. About the only thing that made any sense. Well, of course he did acknowledge the medical [mal]practice. He seemed a little bit surprised by that. I guess he didn't know that I did my homework. You see, when Dr. Krieger was called to the stand I asked him about the death of that newborn mother and her newly born infant which cost him $675,000. He was also sued for leaving another person paralyzed. There were six malpractice cases that I went over. I'm not going to clutter my chart. I have my note. I can read that to you. It's in the record. What did he say as the heat was turned up? Well, it was a residence. [sic] Oh, it was a business decision by the hospital. Oh, really? *1164 They picked up three mistakes? Actually it was the State. As if it was better to him. Oh, so the taxpayers had to pick up for your screw-ups, is that it? What kind of a doctor is this who comes in here for $2900 to exercise his civic duty and tells us that erratic driving means a person shot the gun? He was just like Ira Kuperstein, another professional witness. These guys, both of them, are not very good at their chosen profession. Kuperstein is a consultant which means he can't get a real job. Okay? That means he's got to pick up work in the courts as an expert.
The guy came in here for $10,000 and explained to you how he used his old convert [sic] sneaker to replicate how the victim's foot would have rested on the brake pedal. Explained to you how it took him three times to test the car. What he didn't want to admit to you was because a police officer in our office, Middlesex County Prosecutor's Office, by the name of David Korey pointed out his mistakes. He was trying to pull the wool over your eyes by suggesting this Jaguar would hold on a grade without a foot applied to the brake because that's what he did on the first two tests, on ruddy concrete and on different road surfaces with underinflated tires and the like. When I told him [to] take it to the scene and [he] got a different result[,] he danced around the stand there to say all I wanted to do was check the brake light. Well, both Kuperstein and Krieger knew how to deflect and stick me and jab me with their opinions about coaching and the like, about how Ruppert can't see, and these guys, they get paid to do stuff like that because they're pros. If they were good at what they did they wouldn't be here. For Kuperstein's testimony, $10,000. What did he say that made any sense? He tried to fool you with a videotape that [defense counsel] was a part of. The defense attorney drove the car in question that Kuperstein was sitting in the passenger seat with his camera. I guess you have to trust [defense counsel] as to the rate of speed when you look at this tape because Kuperstein says we practiced a couple times. We tried to get it at 25 miles an hour to replicate how Ruppert was driving by. Well, if you look at that [tape] the distances are off, the angles are off. The victim is barely noticeable or the exemplar I should say. This person that they use is the defendant's twin brother crouched in front of the car blocking the view. Jeffrey says the person was to the right. Again, $10,000 to fabricate evidence, to beat a murder charge. Great country, America, it really is, when you can pay a witness to come up with fraud like this.
[DEFENSE COUNSEL]: Judge, I have to be heard at side bar.
(The following is a discussion at side bar:)
[DEFENSE COUNSEL]: I made an objection some time ago about the prosecutor saying I concocted a story by the use of money. Now he said deliberately the second time that I fabricate, paid $10,000 to fabricate evidence, and now I think it's prejudicial. I ask for a mistrial.
THE COURT: Okay.
[THE PROSECUTOR]: Judge, it's clear that the tape was fabricated. It was produced. Fabricate takes on lots of different connotations, but this tape was put together. It was composed. It was created. I can't think of any other synonyms but it was put together by Dr. Kuperstein. It's my position that it's misleading given the angles, given the depth of field and focus, everything I asked when I crossed him on. There's no doubt this witness was paid. The jury is entitled to assess the witness'[s] interest *1165 in the outcome of the case in determining the credibility of the witness. Dr. Kuperstein said from his point of view, from his eye, Ruppert couldn't see what he could see. I thought the whole videotape issue was objectionable. You let it in[,] and I respect your ruling[,] but it's evidence that was suspect right from the get go. It's not a coincidence from my point of view this man was paid $10,000 to come in and participate in these proceedings. The jury is entitled to know all that when they assess the credibility of the videotape.
THE COURT: Counsel, the term fabrication, however, has another connotation, that is, that the videotape was or is the product of a lie. [That's] essentially what the objection goes to.
Is that correct?
[DEFENSE COUNSEL]: That's right.
[THE PROSECUTOR]: And I'll stand behind that.
THE COURT: There's been no evidence introduced before the jury that any witness lied. The jury has to make that determination with respect to the credibility of the witnesses.
Counsel, I'm going to deny your application for a mistrial. With respect to your application for curative instruction I'll hear you in the alternative.
[DEFENSE COUNSEL]: Judge, I think it's difficult for a curative instruction that's efficacious. A door has been opened. The cow is out of the barn. The toothpaste is out of the tube. It's difficult to put it back. Maybe you would give me a chance to sum up in rebuttal and I think I could deal with it but I don't see how a curative instruction, I can't imagine one because this is the second objection in summation to the exact same point and the impression that the jury is being left with is that I paid for a concocted story and I paid for fabricated evidence.
THE COURT: All right, counsel. I don't perceive it as being as difficult as you do. I am going to advise the jury that it's their job to determine the credibility of witnesses. I am also going to advise the jury, which they will be advised during my final charge, particularly with respect to expert witnesses, that it is not unusual in that it is usually the case that expert witnesses are paid for their testimony. I think that certainly will cure any prejudice that the prosecutor's use of the term fabricate which only does mean from all practical perspectives that a lie was concocted. That's a function for the jury to determine whether or not the experts and any other witness's testimony is credible and therefore worthy of belief.
[THE PROSECUTOR]: May I say one thing about the reference to the lie that I submit was part and parcel of Kuperstein's testimony? I am clearly entitled to say when I think witnesses have lied. [Defense counsel] said that Abilio Cunha lied. I didn't get up here and start dancing making objections because I believe it's proper comment for lawyers in summation to allege lies from witnesses so now for [defense counsel] to say, well, the prosecutor can't call my witness a liar is a specious attack on my summation and it's meant to delay this proceeding. I'd like to get in front of the jury so we can have your charge.
[DEFENSE COUNSEL]: The attack I made on Mr. Cunha was supported by the record, by prior inconsistent statements. Here there is no evidence in the record that Dr. Kuperstein in any way in making this exemplar deviated from the facts that were in the record at the time.
*1166 THE COURT: That's another question for the jury to determine.
[DEFENSE COUNSEL]: I think they need some curative instruction on fabricated.
THE COURT: I already told you I'm going to give them an instruction.
[DEFENSE COUNSEL]: I think we need it now.
THE COURT: I intend to give it to them.
* * * *
(End of discussion at side bar.)
* * * *
THE COURT: Ladies and gentlemen, with respect to expert testimony, I will tell you this again during the course of my final charge, it is not unusual and it is commonplace for experts to be paid for coming to court and rendering testimony and there is nothing unusual about that. Now with respect to whether a witness fabricated testimony or lied, and is worthy of belief or not, is credible or not, is for you, the finder of fact, the jury, to determine, and that is solely within your purview to determine whether or not a witness is credible and therefore worthy of belief.
All right, counsel. Go ahead.
[THE PROSECUTOR]: [Defense counsel] has made certain statements about his case, brought these witnesses whose credibility you will determine; and with respect to the experts and their fees I'll remind you now that the judge will tell you one of the factors involved in assessing credibility is one's interest in the outcome of the case. People who are paid to testify want to win. They want to win on behalf of their client. For what reason? To get hired again. To come back in another trial and get more money. At $10,000 a pop Dr. Kuperstein has a large incentive to make it up to fit his case. He didn't know anything about engineering when it took him three times to do a very simple test on a car.
The prosecutor's summation eventually concluded with a coda on the theme of expert witness compensation:
Nobody that was called by the State, especially the eyewitnesses that came by, had any ax to grind or paid to testify. They all came forward with their honest recollection of what happened. When you sum it all up there's only one thing you can do, that is to find this man guilty, guilty of murder. Thank you.
"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented. * * * Indeed, prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries." State v. Frost, supra, 158 N.J. at 82, 727 A.2d 1 (citations omitted). Nevertheless, "[t]he primary duty of a prosecutor is not to obtain convictions, but to see that justice is done." State v. Ramseur, 106 N.J. 123, 320, 524 A.2d 188 (1987)(quoted in Frost). "It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." State v. Farrell, 61 N.J. 99, 105, 293 A.2d 176 (1972)(quoting Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935)(quoted in Frost)).
Whether particular prosecutorial efforts can be tolerated as vigorous advocacy or must be condemned as misconduct is often a difficult determination to make. In every instance, the performance must be evaluated in the context of the entire trial, the issues presented, and the general approaches employed. Here, there is no question that the prosecutor exceeded the bounds of propriety. Some of the specific challenges to the testimony *1167 of defendant's experts, both in cross-examination and on summation, considered separately, might well have been allowable as instances of tolerable advocacy, but when viewed together in the light of the prosecutor's unsubtle and evidentially unsupported assertions that the experts had sold their integrity for their witness fees, the line established in Smith was crossed. The prosecutor would have been well advised to allow the logic of the State's theory to speak for itself, rather than engaging in a vituperative attack on the individuals conveying the message of the countervailing theory.
The summation in this case began badly with an ill-conceived statement designed to prejudice the jury into viewing the State's case with undue favor:
[THE PROSECUTOR]: * * * I also want to tell you before I begin that this case has not been particularly easy for me. I represent the citizenry of our State. When I come into a courtroom like I did in this case and every other case there is no person sitting in a chair next to me. When that seat is there, it's empty, unlike [defense counsel] who has a specific client sitting next to him. I'm here alone on behalf of the State. I want to make that point `cause I want you to pretend that in that seat next to me are all your friends, neighbors and relatives in the community because it's on their behalf that I bring this case to you and as a public servant it's my obligation and my desire to seek out justice based upon the evidence that was presented.
Inappropriate enough under general principles governing a prosecutor's duty to refrain from excessive conduct calculated to produce a verdict based on the jurors' prejudices rather than the evidence in the case, see Frost, supra, 158 N.J. 76, 83, 727 A.2d 1; Farrell, supra, 61 N.J. at 102-05, 293 A.2d 176 (1972); State v. West, 29 N.J. 327, 338-39, 149 A.2d 217 (1959), that introductory statement, when considered in the light of the entire summation, served to magnify and concentrate all the ensuing improprieties as well as those that had already been perpetrated in cross-examination. The highly prejudicial power of all the defects was undiluted by any offsetting conduct of the prosecutor and could not be adequately remedied by the trial judge's wholly appropriate efforts to mitigate the harm through curative instructions to the jury. The misconduct was not "slight or confined to a single instance, but ... was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." Berger, supra, 295 U.S. at 89, 55 S.Ct. at 633, 79 L.Ed. at 1321.
The prosecutor's summation in this case was a catalog of prohibited defects which "over-stepped the bounds of propriety and created a real danger of prejudice to the accused." Smith, supra, 167 N.J. at 178, 770 A.2d 255 (quoting State v. Johnson, 31 N.J. 489, 511, 158 A.2d 11 (1960)). Many of the Supreme Court's requirements governing the conduct of prosecutors in summation, as elucidated in Smith, constitute a litany of the general misconduct which characterized this prosecutor's behavior. "[P]rosecutors are not permitted to cast unjustified aspersions on the defense or defense counsel." Smith, supra, 167 N.J. at 177, 770 A.2d 255 (citing State v. Frost, 158 N.J. 76, 86, 727 A.2d 1 (1999)). They may not, in ways that are excessive, "directly demean[ ] the credibility of a defense witness." Smith, supra, 167 N.J. at 178, 770 A.2d 255 (citing State v. Rose, 112 N.J. 454, 548 A.2d 1058 (1988)). A "prosecutor's comments [are] `clearly improper' [when they] impl[y] that the expert's testimony was fabricated or contrived with the assistance of defense counsel." Smith, supra, 167 N.J. at 179, 770 A.2d 255 (citing Rose, supra, 112 N.J. *1168 at 518-19, 548 A.2d 1058). An argument that a defense or testimony was "fabricated" is impermissible in the absence of support in the record. Smith, supra, 167 N.J. at 179-80, 770 A.2d 255 (adopting the reasoning of the dissent in State v. DiPaglia, 64 N.J. 288, 298-307, 315 A.2d 385 (1974)(Clifford, J., dissenting)). Prosecutors' summations "discrediting the motivation of expert witnesses `without support in the record' and `apparently based only on the prosecutor's own opinion[,]'" are to be avoided. Smith, supra, 167 N.J. at 180, 770 A.2d 255 (citing State v. Moore, 122 N.J. 420, 462, 585 A.2d 864 (1991)). It is improper for a prosecutor to make "comments... unsupported by the record ... impl[ying] that the experts' testimony had been scripted for them by defense counsel[.]" Smith, supra, 167 N.J. at 181, 770 A.2d 255 (citing State v. Marquez, 277 N.J.Super. 162, 172, 649 A.2d 114 (App. Div.1994), certif. denied, 141 N.J. 99, 660 A.2d 1198 (1995)).
We are cautioned, in turn, to review the record with care in evaluating prosecutorial performance. See Frost, supra, 158 N.J. at 83, 727 A.2d 1. And further, "[a] finding of prosecutorial misconduct does not end a reviewing court's inquiry because, in order to justify reversal, the misconduct must have been `so egregious that it deprived the defendant of a fair trial.'" Smith, supra, 167 N.J. at 181, 770 A.2d 255 (quoting Frost, supra, 158 N.J. at 83, 727 A.2d 1).
The foregoing cross-examination and summation excerpts speak for themselves. They clearly disclose a pattern of prosecutorial excesses that had every capacity to deny defendant the fair and impartial jury review to which he was entitled. Smith also instructs us, specifically, that there is a difference, on the one hand, between commenting upon payment to an expert witness as a basis for presenting the jury with an argument of bias and, on the other hand, with nothing more than the payment itself, concentrating so much on that fact as to transform the argument into an independent collateral issue in the case. Smith, supra, 167 N.J. at 182-85, 770 A.2d 255. The prosecutor's conduct in this case crossed the line. And, because the prosecutor's approach to the most critical proofs in the case was so comprehensively tainted by the conduct we have described, we are left without the requisite sense of confidence that the verdict was the result of a jury assessment of permissible considerations based on the evidence in the case. See, e.g., id. at 188-89, 770 A.2d 255. Accordingly, we are constrained to reverse the convictions and remand for a new trial.
With our determination that the convictions must be reversed and the matter retried, the sentencing issues defendant raises are moot. By way of guidance for the future, however, we note that the record of the sentencing proceeding that occurred discloses no adequate articulation of the trial court's reasons for selecting a seventy-five year prison term from among the range of sentences available. See State v. Kruse, 105 N.J. 354, 359-60, 521 A.2d 836 (1987); State v. Roth, 95 N.J. 334, 359-60, 471 A.2d 370 (1984); see also State v. O'Donnell, 117 N.J. 210, 215-16, 564 A.2d 1202 (1989). Moreover, the rule of State v. Manzie, 168 N.J. 113, 773 A.2d 659 (2001), aff'g, 335 N.J.Super. 267, 762 A.2d 276 (App.Div.2000), decided since this matter was concluded at the trial level, holds that N.J.S.A. 2C:43-7.2, the "No Early Release Act," does not apply to murder convictions for crimes antedating the amendment of the statute effective June 29, 2001.
Reversed and remanded.