**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4193-14T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JOHN F. TORNESE a/k/a JOHN
TORNESE, JR.,

    Defendant-Appellant.

_____

Submitted October 13, 2016 — Decided November 20, 2017

Before Judges Simonelli and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment Nos. 12-06-1334, 12-10-1546, and 12-12-1137.

Joseph E. Krakora, Public Defender, attorney for appellant (David A. Gies, Designated Counsel, on the briefs).

Diane M. Ruberton, Acting Atlantic County Prosecutor, attorney for respondent (Brett Yore, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Defendant John F. Tornese was charged in Atlantic County Indictment No. 12-06-1334 with second-degree witness tampering, N.J.S.A. 2C:28-5(a) (count one), and five counts of third-degree terroristic threats, N.J.S.A. 2C:12-3(a) (counts two, three, four, five, and six). Defendant was also charged in two related single count indictments from different jurisdictions, Bergen County Indictment No. 12-10-1546 and Mercer County Indictment No. 12-12-1137, each charging defendant with third-degree terroristic threats, N.J.S.A. 2C:12-3(b). The charges stemmed from defendant threatening Mark Singer,[1] a business associate from whom he had purchased a pay phone business, and John Corigliano, another business associate who had purchased pay phone routes from defendant. The charges also related to defendant threatening Singer's two attorneys and an employee of one of the attorneys.

On defendant's motion, the indictments were joined for trial, pursuant to Rule 3:15-1(a). Following a jury trial, defendant was convicted on counts one, two and four of Indictment No. 12-06-1334 pertaining to Singer. Defendant was also convicted of the lesser-included offense of harassment, N.J.S.A. 2C:33-4, a petty disorderly persons offense, on counts three, five and six of Indictment No. 12-06-1334, as well as Indictment Nos. 12-10-1546

---

[1] Singer's name alternatively appears as Marc and Mark Singer at various places in the record.

and 12-12-1137 pertaining to Corigliano, Singer's two attorneys, and the employee of one of the attorneys.

Defendant appeals from his March 10, 2015 judgment of conviction arguing:

POINT ONE

THE PROSECUTOR'S COMMENTS DURING SUMMATION TO WHICH THE DEFENDANT OBJECTED WERE CLEARLY AND UNMISTAKABLY IMPROPER WHERE THE REMARKS SUBSTANTIALLY PREJUDICED THE DEFENDANT'S FUNDAMENTAL RIGHT TO HAVE A JURY FAIRLY EVALUATE HIS GUILT BASED ON ONLY THE EVIDENCE ADMITTED.

POINT TWO

THE DEFENDANT'S CONVICTION OF WITNESS TAMPERING SHOULD BE SET ASIDE WHERE THE STATE PRESENTED NO EVIDENCE THAT THE DEFENDANT WAS ARRESTED OR SERVED A COMPLAINT FOR CONDUCT AGAINST THE ALLEGED VICTIM PRIOR TO MARCH 21, 2012.

After considering the arguments presented, in light of the record and applicable law, we affirm.

I.

We recite the facts, taken from the record of the five-day jury trial, during which the State produced sixteen witnesses, eight of whom were law enforcement personnel. Five witnesses testified for the defense, including defendant. Defendant, an entrepreneur, was involved in civil litigation with Singer and Corigliano related to contract disputes in their separate business

dealings involving pay phones. Around 2008, defendant sued Singer and his corporation in Pennsylvania over Singer's sale of the pay phone business to defendant. Beginning in 2009, Charles Indyg represented Singer's corporation in the lawsuit. Defendant, who was also represented by counsel in the litigation, prevailed in the lawsuit. However, defendant was unable to collect on his judgment because Singer's corporation filed for bankruptcy. Darren Baldo represented Singer's corporation in the bankruptcy proceeding which concluded when the bankruptcy petition was dismissed in October 2011.

In 2010, defendant also sued Corigliano and his corporation in Pennsylvania for withholding payment on their pay phone contract. However, an arbitration clause in the contract prevented defendant from litigating the dispute in court. Corigliano ultimately obtained a favorable arbitration decision in 2013. However, defendant obtained a default judgment against Corigliano in a defamation lawsuit based on Corigliano informing the arbitrator about alleged threats defendant had made to Corigliano and others.

Taking matters into his own hands, through text messages and phone calls, defendant threatened individuals connected with the litigation, specifically Singer, Corigliano, Singer's attorneys, Indyg and Baldo, and an employee of Indyg, Howard Beaumont.

4

Defendant also threatened Singer to prevent him from testifying against him in connection with a criminal complaint Singer filed against defendant when the threats started. Using two prepaid phones, defendant made the threats on September 6, 2011 and March 21, 2012. The numbers were traced back to defendant from phone records showing that the same numbers called his mother and the law firms that represented him in the litigation on the same dates. In addition, some of the witnesses recognized defendant's voice and, during some of the calls, defendant actually identified himself.

As to the specific threats, Singer, who was previously convicted of tax evasion in 1992, testified that on September 6, 2011, he received "four or five" phone calls from defendant, threatening Singer and his family. Singer recognized defendant's voice from his distinctive stutter as well as from their business dealings and the litigation. According to Singer, defendant "was irate and upset about the ongoing litigation in the bankruptcy court[.]" Defendant threatened to "cut[] [Singer's] brake lines[,]" and told Singer "[he] better back off the litigation," or otherwise "he would kill [him.]" Because of these threats, Singer stopped answering the phone, prompting defendant to send Singer similar threatening text messages. Singer was disturbed

and alarmed by the threats, and filed a citizen's complaint with the Brigantine Police Department a few days later.

Singer testified further that, on March 21, 2012, he received additional telephonic and text message threats from defendant. Defendant told Singer not to "show up" to testify against him in connection with the September 2011 citizen's complaint. Defendant threatened to "burn[] down [Singer's] house," and to "beat the crap out of [you] faggots," referring to Singer and Robert Smith, Singer's partner of twenty-seven years. Defendant threatened to tie up Smith and "make him watch as he cut off [Singer's] penis and watch [Singer] bleed out[.]" Of the three text messages Singer received from defendant on that date, the first stated "Singer, you're a fucking . . . faggot, you're fucking dead." The second stated "I should kill you just because you're gay." The third stated "I'm going to kill you, your boyfriend and your lawyer, you fucking homo." Singer testified he felt "intimidated[,]""terrified[,]" and "scared to death." He believed that the threats could be carried out because "[y]ou see things in the news all the time." As a result, he went to the police station a second time and filed another citizen's complaint.

In addition to representing Singer in legal matters, Indyg was a longtime friend of Singer and his business partner in unrelated business ventures. Indyg testified that on March 21,

2012, at about 11:30 a.m., he received a text message stating "that [he] was going to be dead" and threatened "to blow up [his] office," "[his] house," and "[his] red pick[-]up truck[.]" Later in the day, at around 1:00 p.m., Indyg received a phone call from the same phone number reiterating the threats and "threatening to kill [him]," "[his] [ten]-year-old daughter," and "[his] wife[.]" Although the caller did not identify himself, Indyg recognized the voice as defendant's from having cross-examined defendant for over two hours in the litigation of the contract dispute. Indyg was alarmed by the threats, and "felt like [he] was in danger."

After receiving the text message and phone call, Indyg returned to his office. His assistant, Beaumont, informed him that he had received a series of calls that morning that were essentially "hang-ups." According to Beaumont, the caller eventually spoke during one of the calls, identified himself as John Tornese, and indicated that he was looking for Indyg. Beaumont stated the caller yelled on the phone, using "a bunch of expletives[.]" The caller warned Beaumont about being "involved" with Singer and Indyg, and threatened to "kill" Beaumont, "blow up" Indyg's red truck, and "set fire to the office." The caller also told Beaumont to allow his call to go through to voicemail so that he could leave a message for Indyg. Accompanied by Beaumont, Indyg went to the Egg Harbor Township Police Department

and signed a citizen's complaint against defendant. Although Indyg showed the police officer the text message from defendant on his phone while filing the complaint, Indyg accidentally lost the text by the time of trial.

Baldo testified that, initially, in September 2011, an individual identifying himself as defendant called his office and threatened him to stop the bankruptcy litigation involving Singer. He told Baldo to "fuck off" or he would "kill [him]," and "burn [his] office down." Baldo told defendant not to threaten him and to have his (defendant's) attorney call his office to talk about the case. Then, Baldo hung up the phone. On the morning of March 21, 2012, defendant called Baldo's office again and made even worse threats. According to Baldo, defendant threatened "to tie [him] up[,]" "rape [his] wife," and "stick a knife in her ass while [he] watched." Baldo was extremely alarmed by the threats, particularly those directed at his wife.

Laura Crawford, Baldo's paralegal, had transferred the call to Baldo because the caller claimed to be referred by a friend. After she transferred the call, Baldo put the phone on speaker and Crawford overheard the caller identify himself as defendant and "yell[] threats" at Baldo. Accompanied by Crawford, Baldo went to the West Windsor Police Department to file a citizen's complaint. While en route to the police station, Baldo received

additional threatening calls from defendant on his cell phone and, while at the police station, Baldo received similar threatening text messages.

Corigliano testified that at about 11:00 a.m., on September 6, 2011, he received a phone call threatening his life. Although the caller stated he was "calling for [defendant]," as the conversation continued, Corigliano recognized defendant's voice from his distinctive stutter, particularly with "the word you, you, you, you, you." Defendant threatened "to kill" Corigliano if he did not "pay him right away[.]" Shortly thereafter, Corigliano received a text message with a similar threat. Alarmed by the threats, Corigliano filed a report with the Fort Lee Police Department. The officer taking the report indicated that the text message stated "you mess with the wrong fucker, you're going to get it."

Corigliano testified further that at about 11:30 a.m., on March 21, 2012, he received another threatening phone call from a telephone number with the same area code, but a different number than the September 6, 2011 call. The caller identified himself as John Tornese, and Corigliano recognized the voice as defendant's. About forty-five minutes later, he received a similar threat via text message. About an hour later, while he was having lunch with his friend, Steve Tellini, he received a phone call on

9

his cell phone from the same number as the earlier call. Corigliano asked Tellini to answer the phone for him so that he would have a witness. Tellini complied and heard a man screaming obscenities and threats. Specifically, the caller threatened that he was going to burn down Corigliano's house. Tellini drove Corigliano to the Fort Lee Police Department to file a citizen's complaint. The officer taking the report recorded the text message as stating "I'm going to kill you."

Defendant testified and acknowledged that "[he] stutter[ed]." However, defendant denied the allegations and any connection to the phone numbers in question. Defendant claimed that he became aware of the allegations in September 2011, when he received the criminal complaint in the mail and consulted his attorney. According to defendant, when he went to court to answer the complaint, Baldo, Singer and Indyg "tried to bully [him]" to get him to "drop all [his] civil charges" and threatened him with "jail" if he did not. Two character witnesses testified on defendant's behalf about his reputation for peacefulness and honesty in the community.

Defendant's motion for a judgment of acquittal, pursuant to Rule 3:18-1, made at the close of the State's case, was denied, as was defendant's motion for a new trial, pursuant to Rule 3:20-1, made after the verdict was rendered. On February 20, 2015,

defendant was sentenced in the third-degree range, <u>N.J.S.A.</u> 2C:44-1(f)(2), to a three-year term of imprisonment on count one of Indictment No. 12-06-1334. Counts two and four of Indictment No. 12-06-1334 were merged into count one, and fines and penalties only were imposed for the harassment convictions. This appeal followed.

## II.

Defendant argues that the prosecutor's comments during summation were improper, and "the trial court's instruction did not cure the prejudicial nature of the prosecutor's comments." Specifically, defendant argues the prosecutor improperly "referenced the defendant's failure to obtain certain evidence that would have likely exonerated him" and "attempted to bolster the credibility of the two lawyers who testified on behalf of the State." According to defendant, "[c]oupled with the prosecutor's comment that the defendant's character witness had nothing to say about the facts of the case, these two clearly and unmistakably improper remarks were fatal to the State's prosecution of the defendant."

While prosecutors are entitled to zealously argue the merits of the State's case, <u>State v. Smith</u>, 212 <u>N.J.</u> 365, 403 (2012), <u>cert. denied</u>, 568 <u>U.S.</u> 1217, 133 <u>S. Ct.</u> 1504, 185 <u>L. Ed.</u> 2d 558 (2013), they occupy a special position in our system of criminal

11                                                          A-4193-14T2

justice.  State v. Daniels, 182 N.J. 80, 96 (2004).  "[A] prosecutor must refrain from improper methods that result in a wrongful conviction, and is obligated to use legitimate means to bring about a just conviction."  Ibid. (quoting State v. Smith, 167 N.J. 158, 177 (2001)).

In considering accusations of improper comments by the prosecuting attorney, we examine whether defense counsel made a timely objection, whether the prosecuting attorney withdrew the remarks, and whether the judge acted promptly and provided appropriate instructions.  Smith, supra, 212 N.J. at 403.  We are also mindful that a prosecutor may vigorously rebut specific arguments made by defense counsel.  State v. R.B., 183 N.J. 308, 329-32 (2005).

"Our task is to consider the 'fair import' of the State's summation in its entirety."  State v. Jackson, 211 N.J. 394, 409 (2012) (quoting State v. Wakefield, 190 N.J. 397, 457 (2007), cert. denied, 552 U.S. 1146, 128 S. Ct. 1074, 169 L. Ed. 2d 817 (2008)).  "Whether particular prosecutorial efforts can be tolerated as vigorous advocacy or must be condemned as misconduct is often a difficult determination to make.  In every instance, the performance must be evaluated in the context of the entire trial[.]"  State v. Negron, 355 N.J. Super. 556, 576 (App. Div. 2002).  Even if the prosecutor exceeds the bounds of proper

12

conduct, "[a] finding of prosecutorial misconduct does not end a reviewing court's inquiry because, in order to justify reversal, the misconduct must have been 'so egregious that it deprived the defendant of a fair trial.'"   Smith, supra, 167 N.J. at 181 (quoting State v. Frost, 158 N.J. 76, 83 (1999)).  Such is not the case here.

Here, the challenged comments were responsive to defense counsel's specific arguments during her summation.  Defense counsel zealously attacked the credibility of the two lawyers, who testified for the State about being victimized by defendant's threats.  The prosecuting attorney responded:

> I want you to focus on this, though.  Why would two lawyers risk their license if this is all an attempt to get [defendant]?  Why would they risk their careers, their license?  What was their reward?  What were they going to get out of it?  That they all had motive.

Defense counsel also criticized law enforcement's handling of citizen complaints.  She referred to the testimony of Officer Lancaster, the police officer who processed Indyg's citizen complaint and characterized such complaints as a "he said-she said complaint."  In addition, defense counsel explicitly criticized the investigation conducted by the prosecutor's office investigator and explained that it was defendant's investigation, rather than the State's, that resulted in the acquisition of the

13

phone records which the State then "used . . . to build a case against [defendant.]" In response, the prosecuting attorney stated:

> Now, there was also talk about police procedure in the prosecutor's office. You heard testimony from my investigator about when she was involved in the case and what had already been done. Came in much later, and for the most part, what evidence would you obtain that was not already out there by the time our office got the file. If the voice mails weren't there when Lancaster or whoever else did the investigation on the 6th of that week or whenever they did it, it's 2011, they don't exist in 2014. The phones are out there. We got the phones. This case is about paperwork, and you've been presented with a ton of it, and we all have the paperwork. Now mind you, the records, the phone records were acquired by his attorney, same attorney who could have expanded the search and got a full set of records. Why didn't they do that?

Defense counsel objected to the prosecuting attorney's comments. She also objected to the prosecuting attorney's "reference that the character witness didn't testify factually." After a colloquy with counsel, the judge gave a strong curative instruction, stating:

> [L]adies and gentlemen of the jury, before I give you my charge, I'm just going to give you some additional instructions on how to consider . . . closing statements . . . . You may have heard a reference by the State regarding defense counsel obtaining phone records and could have obtained additional phone records, I remind you now and I'll remind you again in my final charge that the

14

defense has no obligation in the case to come forward with any evidence, and to the extent that you might believe that they had some duty, you're to disregard those comments, and the defense, of course, has no obligation to produce or provide anything to the State.

You heard also a reference to the licensing of lawyers and what that may mean to somebody by way of having a motive or otherwise, that was argument by the State. You may consider it for whatever purpose you may wish to, but there's no evidence in the case about lawyers and lawyer licensing and having any bearing on the facts in this case.

And finally you heard some closing remarks regarding Mr. Ramos who testified. He was called by the defense as a character witness. He . . . was not providing factual information about the allegations in the case, and I'll give you an instruction in just a few minutes on how to treat character testimony as a special type of testimony and it has special rules and when you're considering Mr. Ramos testimony, however it was referred to by [the prosecuting attorney] or [defense counsel], you should consider his testimony only under the instructions that I'll give you in just a few minutes.

The judge reiterated the instructions in the final jury charge. We presume the jury understood and followed those instructions. Smith, supra, 212 N.J. at 409.

Next, defendant argues that the jury's verdict on the witness tampering count "was against the weight of the evidence and should be set aside." In ruling on defendant's new trial motion, the judge rejected this argument, determining that there was no

"manifest denial of justice[.]"  According to the judge, the verdict was based on "credibility" assessments and "the quantum of evidence[,]" both of which were "jury questions."  The judge explained:

> [T]he jury had the ability to assess the credibility of Marc Singer in particular, to sift through the evidence and to decide who was being forthcoming. . . . [B]ased on the testimony . . . , it does appear that Mr. Singer's testimony, while it didn't flow as chronologically or clearly as it might have done, did provide the jury with enough evidence in which to convict based on the telephone call that he received that he believed that he was being threatened to back off from litigation and not to continue with his proceedings that involved the defendant.

In considering whether a guilty verdict was against the weight of the evidence produced at trial under Rule 3:20-1, "our task is to decide whether 'it clearly appears that there was a miscarriage of justice under the law.'"  State v. Smith, 262 N.J. Super. 487, 512 (App. Div.) (quoting R. 2:10-1), certif. denied, 134 N.J. 476 (1993).  "We must sift through the evidence 'to determine whether any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present.'"  Ibid. (quoting State v. Carter, 91 N.J. 86, 96 (1982)).  Our "objective is not to second-guess the jury but to correct [an] injustice that would result from an obvious jury error."  State v. Saunders, 302 N.J. Super. 509, 524 (App. Div.), certif. denied,

16

151 <u>N.J.</u> 470 (1997) (citation omitted). We do not evaluate the evidence and determine anew how we might have decided the issues.

Applying these standards, we conclude that the State presented sufficient proofs to establish beyond a reasonable doubt that defendant was guilty of witness tampering. To prove witness tampering, the State was required to prove that "believing that an official proceeding or investigation is pending or about to be instituted[,]" defendant "knowingly engages in conduct which a reasonable person would believe would cause a witness" to:

> (1) Testify or inform falsely;
>
> (2) Withhold any testimony, information, document or thing;
>
> (3) Elude legal process summoning him to testify or supply evidence;
>
> (4) Absent himself from any proceeding or investigation to which he has been legally summoned; or
>
> (5) Otherwise obstruct, delay, prevent or impede an official proceeding or investigation.
>
> Witness tampering . . . is a crime of the second degree if the actor employs force or threat of force. Otherwise it is a crime of the third degree.
>
> [<u>N.J.S.A.</u> 2C:28-5(a).]

Witness tampering "is committed only when a defendant acts believing an official proceeding has been or is about to be

instituted." State v. D.A., 191 N.J. 158, 170 (2007). "Although there could be a case in which a defendant actually expresses his belief in the pendency of official action at the time of a tampering offense, . . . such a scenario would be unusual." Ibid. "Therefore, the proofs in a tampering case will ordinarily be circumstantial[,]" and "evidence that defendant was aware of facts that would lead a reasonable person to believe that an official action was pending or about to be instituted" will be necessary "to establish the requisite state of mind." Ibid.

"For example, if a defendant in a tampering case has been arrested or has been served with a complaint . . . , he will satisfy the requirement of a belief that an official proceeding is pending because a reasonable person would hold that belief based on the facts." Id. at 170-71. "The same is true if a defendant encourages a witness, who he knows has been called to testify . . . to elude the legal process of which he is aware, N.J.S.A. 2C:28-5(a)(3), or absents himself from a proceeding or investigation to which he has been summoned, N.J.S.A. 2C:28-5(a)(4)." D.A., supra, 191 N.J. at 171.

Here, there was ample evidence showing that defendant was aware of a pending official proceeding when he contacted Singer on March 21, 2012. Indeed, defendant admitted being aware of the pending criminal complaint filed by Singer in September 2011, and

Singer testified that he construed defendant's threat not to "show up" to refer to Singer's anticipated testimony in connection with the September 2011 complaint. Therefore, the trial judge properly denied defendant's motion for a new trial and we reject defendant's contention to the contrary.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4193-14T2