**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4590-14T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LORETTA C. BURROUGHS,
a/k/a LORETTA D. DOYLE,
LORETTA DOYLD, LORETTA
THOMAS, LORETTA C. TOKASH,

    Defendant-Appellant.

_____

Submitted March 16, 2017 — Decided May 24, 2017

Before Judges Lihotz and Hoffman.

On appeal from Superior Court of New Jersey,
Law Division, Atlantic County, Indictment No.
14-04-0789.

Joseph E. Krakora, Public Defender, attorney
for appellant (Rochelle Watson, Assistant
Deputy Public Defender, of counsel and on the
brief).

Damon G. Tyner, Atlantic County Prosecutor,
attorney for respondent (Courtney M.
Cittadini, Assistant Prosecutor, of counsel
and on the brief).

PER CURIAM

Following a jury trial, defendant Loretta C. Burroughs was convicted of the murder of her husband, <u>N.J.S.A.</u> 2C:11-3(a)(1) and (2) (count one), and third-degree hindering apprehension, <u>N.J.S.A.</u> 2C:29-3(b)(1) (count two). She was sentenced to a prison term of fifty-five years, subject to the No Early Release Act (NERA), <u>N.J.S.A.</u> 2C:43-7.2. Defendant now appeals from the May 13, 2015 judgment of conviction, arguing:

<u>POINT I</u>

THE PROSECUTOR EXCEEDED THE BOUNDS OF PROPRIETY DURING OPENING STATEMENTS WHEN HE COMPARED DEFENDANT TO THE CONNIVING WOLF IN "LITTLE RED RIDING HOOD" AND DURING SUMMATION WHEN HE IMPLORED THE JURY TO DENY DEFENDANT "ONE LAST FAVOR," I.E., AN ACQUITTAL.

<u>POINT II</u>

THE TRIAL COURT ERRED IN RULING THAT TWO NINETEEN-YEAR-OLD CONVICTIONS, FOR WHICH DEFENDANT WAS RELEASED FROM CONFINEMENT SEVENTEEN YEARS AGO, WERE ADMISSIBLE TO IMPEACH DEFENDANT'S CREDIBILITY.

<u>POINT III</u>

THE TRIAL JUDGE ERRED IN FINDING AGGRAVATING FACTOR SIX AND IN FAILING TO FIND MITIGATING FACTOR SEVEN, ON THE BASIS OF NINETEEN-YEAR-OLD CONVICTIONS.

We affirm.

I.

Daniel Burroughs, defendant's husband, was last seen alive by next-door neighbor Ronald Roberts on August 2, 2007. At that

2

time, defendant told people the couple had been discussing a move from Mays Landing to Florida. Defendant expressed the move was imminent and related her reluctance to leave her daughter Nicole DiDomizio and grandchildren, who lived in New Jersey. DiDomizio testified defendant told her she would not move to Florida and believed Daniel would move without her. Defendant asked DiDomizio not to reveal her intentions to stay in New Jersey until after Daniel left for Florida.

DiDomizio wanted to wish Daniel well, but did not want to betray defendant's confidence. She purchased a card expressing the sentiment "good luck on your trip." She gave it to Daniel when defendant was not home, and he seemed confused, asking, "[W]hat is this for?"

Earlier, in June 2007, defendant, who worked in an assisted living facility, met Enid Hyberg, the daughter of a resident. Defendant solicited Hyberg, an attorney, to prepare Daniel's power of attorney, which authorized defendant to act for him in the sale of their home. Defendant told Hyberg Daniel would be out of town at various points during the sale and it was more convenient for her to handle any paperwork. As Daniel's attorney-in-fact, defendant was empowered to "execute the contract, to attend closing, to sign closing papers, and to deal with the proceeds of the sale of the home." Hyberg recognized this as "really a very

standard and routine circumstance[,] under which you would have a power of attorney."

During this same period, Ed Dwyer's mother was a resident of defendant's assisted living facility. Defendant told him she needed a power of attorney notarized because her husband left for Florida and although they sold their house, the "deal wasn't finished." She asked Dwyer if he knew anyone who could notarize the document for her. Dwyer agreed to present Daniel's power of attorney to his sister-in-law, who was a notary. During trial, the notary testified she did not date the document. Reviewing the document marked for identification, the notary stated someone added the date after she completed the notarization.

DiDomizio, who was not familiar with Daniel's signature, thought the signature and date affixed on the power of attorney, resembled her mother's handwriting. On the other hand, Daniel's close friend and neighbor, Robert Valiante, thought Daniel would execute a power of attorney because he was not a detailed "paperwork guy." In addition, Daniel's brother, Raymond Wantorcik, stated he thought the signature on the power of attorney appeared to be Daniel's.

DiDomizio also related events occurring after Daniel disappeared. On August 3, 2007, defendant, DiDomizio, and her family were scheduled to attend a three-day pre-arranged trip to

Sesame Place. Defendant arrived at the DiDomizio's home several hours late. While waiting for defendant to arrive, DiDomizio called defendant's cell and home phones numerous times and received no answer. When defendant finally arrived, she was frantic, crying and "completely emotional." Initially, defendant offered no reason for her late arrival; eventually, she admitted she fought with Daniel. DiDomizio recalled during the three-day trip, defendant excused herself stating she was going to her room to call Daniel. DiDomizio heard defendant talking to someone, although she did not hear the conversation and could not confirm it was Daniel.

Shortly after they returned from Sesame Place, defendant revealed additional details regarding her alleged difficulty with Daniel. Defendant told DiDomizio Daniel "left her, he had just gone and left everything behind because he was angry." Later, defendant stated Daniel went to Florida with another woman, who drove a yellow Hummer. DiDomizio testified defendant never told the same story regarding Daniel's departure, and it was difficult to keep track of all the variations.

DiDomizio also discussed the couple's past relationship difficulties. For years, defendant expressed her feeling Daniel would leave her because defendant had an affair in the 1990s.

Therefore, DiDomizio was not surprised Daniel left, but she was surprised he left without his belongings.

In the ensuing weeks, defendant asked DiDomizio to help her sell Daniel's tools and construction equipment, stating she was in "dire financial strai[]ts." With DiDomizio's help in drafting ads, defendant sold "everything that she could" through sites like Craigslist and Ebay, including Daniel's drum set, amplifiers, model airplanes, and a jet boat. The title to Daniel's pick-up truck was later transferred to DiDomizio, who stated, "there was pretty much nothing that remained of Dan's by the time everything was done and said."

Defendant also solicited help from Roberts to sell Daniel's tools, which another friend estimated were valued at $10,000 to $12,000; his construction equipment valued between $5,000 and $6,000; and his boat, worth approximately $2,500. Roberts assisted defendant in the sale of many of Daniel's tools, and she gave him a compressor and a model helicopter for his son.

While Roberts was helping defendant catalogue the various tools, he noticed a smell "like a roadkill." Defendant told him the odor emanated from a dead groundhog Daniel killed, but left beneath a tarp. When Roberts returned the next day, the tarp was gone and he saw mothballs spread along the ground.

Defendant asked Roberts, and he agreed, to cut open a home safe. When the open safe's contents revealed a few documents, defendant yelled, "Oh my [G]od, he took my money." Finally, Roberts noted defendant said she injured her back moving a trellis that had blown over. Roberts never saw the trellis down.

Daniel's brother, Wantorcik, also testified. He explained in late July 2007, Daniel suffered a shoulder injury, which required surgery. He often called to check on Daniel's recovery. Wantorcik noted Daniel seemed "very lethargic" and "slow" and defendant was overseeing administration of his medication since he was home.

During an August 10, 2007 call, defendant told Wantorcik Daniel left for Florida. Wantorcik questioned defendant, who replied, "he left me for a younger woman, Raymond, he left me, he left me." Wantorcik was skeptical. He knew Daniel wanted to sell his home and move to Florida, but did not believe Daniel would ever leave without selling the house.

Wantorcik's suspicions led him to visit defendant's home unannounced the following weekend. He found defendant in one of Daniel's sheds with a notepad, appearing to take an inventory of the tools and equipment. When she saw Wantorcik, defendant seemed startled, then "turned on the tears." She told him how upset she was because Daniel left her and said neighbors saw a yellow Hummer

7                                                    A-4590-14T2

with a Florida license plate in front of the house. Wantorcik noted two pieces of heavy equipment were missing and defendant explained Daniel sold them before he left town and took all of the money in the family safe.

Wantorcik returned the next weekend. He noted more tools missing. Defendant asserted Daniel sold them before he left. Over the ensuing weeks, defendant repeatedly told Wantorcik Daniel called and instructed his brother could have any of his belongings. Wantorcik requested defendant record her next phone call, then, "all of a sudden[, Daniel] didn't call anymore."

Wantorcik became very suspicions because "nothing added up, nothing made sense." He told defendant he intended to file a missing persons report. Defendant retorted: "Why the fuck do you gotta do that? I just told you he called this morning." Wantorcik went to the Hamilton Township Police Department (HTPD) on September 1, 2007, because he "knew [his] brother was dead."

HTPD Officer James Jacobi took Wantorcik's report and entered Daniel's name into the national missing persons database. In his report, Officer Jacobi recorded comments from his interview with defendant. She stated she last saw Daniel on August 14, 2007, and repeated that Daniel ran off with a younger woman driving a yellow Hummer. She insisted Daniel took his personal belongings and their money, which they kept in a home safe. She acknowledged

Daniel left his cell phone and insisted he called twice using a private number. Defendant related, Daniel told her he intended to return in a couple weeks "to settle things up."

The police interviewed Daniel's friend, Valiante. Shortly after Daniel's disappearance, defendant called Valiante and told him Daniel moved to Florida with another woman. At defendant's request, Valiante went to the home. Defendant offered to sell Valiante Daniel's tools. Valiante expressed reluctance and was struck when defendant told him not to worry because "he's not coming back." Valiante was skeptical of defendant's story as he did not believe Daniel would leave without telling him or before he sold his home.

Valiante also noticed a very strong odor in the backyard and saw mothballs strewn on the ground. Defendant told him the smell was a dead woodchuck. He testified he rejected this explanation because the odor did not resemble the smell of a dead animal. Valiante also observed defendant was not moving well. She stated she hurt her back moving the trellis, which he did not think appeared to have fallen over.

Valiante's suspicions motivated him to tape a phone conversation with defendant. At trial, the State played the recording for the jury, and provided a written transcription of

the conversation. During the call, defendant claimed Daniel left her for another woman, and took their savings.

New Jersey State Police Lieutenant Wanda Stojanov was assigned to the missing persons investigation. Lieutenant Stojanov interviewed defendant twice, and her trial testimony noted inconsistencies in defendant's statements.

Lieutenant Stojanov first spoke with defendant on November 7, 2007. Defendant described her trip to Sesame Place with her daughter's family, and stated Daniel was gone when she returned on August 5. Defendant reiterated her belief Daniel left with another woman, and stated she saw a yellow Hummer with Florida registration parked at her home. Defendant also told Lieutenant Stojanov Daniel called to insist he receive one-half of the proceeds from the sale of their home. Defendant admitted Daniel left his watch, cell phone, and wallet. Lieutenant Stojanov inspected the backyard, with defendant's consent. She recorded "nothing evidentiary" and did not detect any unusual odor.

Almost a year later, on September 10, 2008, Lieutenant Stojanov spoke to defendant a second time. In this interview, defendant's account of events changed. Defendant told Lieutenant Stojanov Daniel was home when she returned from the trip with her daughter's family, but she learned he left the next day, while she was working. She also claimed she saw a yellow truck leave her

residence and insisted Daniel took his watch, wallet, birth certificate, and personal items.

Defendant sold the former marital home, and placed the proceeds in an escrow account. She relocated to Corbin City, retained counsel, and filed for divorce, citing no-fault grounds of eighteen months separation. Claiming she was unaware of Daniel's address, an order permitted service through publication. The final judgment of divorce awarded defendant half the escrowed sale proceeds as equitable distribution. A post-judgment application resulted in an order releasing the remaining monies to defendant as alimony.

Defendant moved to Ventnor. On May 15, 2013, police executed a warrant to search this residence to look for documents relating to the sale of the marital home. Earlier, a warrant allowed police to search the grounds of the Mays Landing property accompanied by a cadaver dog, which proved fruitless. When Atlantic County Prosecutor's Office Detective Lynne Dougherty informed defendant police were about to search her Ventnor home, she witnessed defendant's reaction as: her "whole body sunk," "[s]he lost color in her face[,]" began wringing her hands, and seemed nervous.

Atlantic County Prosecutor's Office Detective Caroline MacDonald, of the Forensic Crime Scene Unit, participated in the search of the Ventnor residence. In an upstairs closet, detectives

11

found human remains inside two large Tupperware containers. Each container was wrapped in nine layers of plastic trash bags, with scented beads and dryer sheets between each layer. Detectives noticed a strong odor of decomposition and notified the medical examiner, who transported the containers to the morgue.

The first container held the "entire right upper extremity" of a human body, a human skull and a purse lying in decomposition fluid, which contained the separated jaw bone. The remainder of the body was in the second container and included the left upper arm, pelvis, lower vertebrae, and both legs, along with a knife sharpener. The medical examiner determined the cause of death was homicide, and the "circumstances surrounding the death . . . was assault[] by another person." The extent of decomposition prohibited the State's expert forensic scientists from conclusively identifying the cause of death, but the experts detailed various knife cuts, saw marks, and trauma inflicted upon the body.

The State presented two forensic odonatologists, who examined the remains against Daniel's dental records. Although there were some dissimilarities, they both concluded the remains were Daniel Burroughs.

12                                                    A-4590-14T2

Defendant seeks reversal of her conviction and a new trial claiming the prosecutor's opening statement and summation were inappropriate and rose to misconduct. Defendant contends the prosecutor's remarks portraying her as a master manipulator of friends and family, improperly swayed the jury's emotions, and deprived her of a fair trial. We pause to recite the challenged comments.

During opening, the State referenced the fable of "Little Red Riding Hood," remarking "like all these old folk tales, there's a lesson to be learned, there's a moral to the story." The theme then presented was "not everyone or everything is as it seems." The prosecutor disavowed any analogy and stated he was not "trying to call defendant a wolf," saying:

> This defendant tried to convince everyone she was a nice lady, a loving mother, a caring grandmother. And in fact, a victim, a victim of her husband having left her for another woman. During the course of trial, I want you to look more closely. I want you to look behind the disguise.

The State's opening repeated the suggestion to look behind the disguise and examine what defendant was actually doing, and specifically suggested the jury must do what Little Red Riding Hood did: "the more she interacted with the wolf, the more she realized something was wrong."

Defendant objected and the trial judge addressed the jury, explaining: "[W]hat the lawyers say to you in their opening statements is not evidence. They're giving you a summary of what they expect to prove. . . ."

In summation, the prosecutor refrained from further references to "Little Red Riding Hood." Instead, comments centered on defendant's façade as fragile and helpless, a victim of her husband's infidelity, who was left financially destitute, then accused her of acting under the façade of a "helpless grandmother," because defendant was manipulative and asking for "one last favor," an acquittal. The prosecutor stated:

> [D]efendant needs you. She needs just one more favor. Can you please help her just this one last time because she's almost there, right? She's almost there. After eight years, you are the last thing to stand in her way between justice and getting away with murder, so she needs you.
>
> Hasn't she told you the stories of the yellow Hummer and the woman down in Florida? Hasn't she cried here for court [sic]? Hasn't she said she's a grandmother of four and she needs you, she needs this favor? Can you help her out this one last time?
>
> Because without this favor, she has to face justice, and that's what she's spent these last eight years avoiding. She's lied. She's manipulated. She's asked for favors for eight years to get to this point, to be one step away from getting away with it.
>
> . . . .

She's asked a lot of people for a lot of favors. And you've heard it from witness after witness. She tells a sad story. She says I just need a favor. Can't you help me out. And she's done this from witness to witness to witness. . . . Don't be the last person she talks into helping her.

. . . .

And I don't want a favor from you. What I want you to do is consider every piece of evidence you get back there. I want you to use your logic. I want you to trust your guts. I want you to think about this trial and I want you to say no to the defendant for the first time. Be the first people to tell this defendant no. And you can do that because you know that this story ends with the defendant being $100,000 richer and Danny Burroughs in her closet in Tupperware. I don't want a favor. I want justice for Danny Burroughs.

Defendant objected and the trial judge issued a curative instruction. The judge reminded the jurors closing arguments were not evidence and, in reaching a verdict, they should rely only on the evidence presented at trial. Not satisfied, defendant requested the judge issue a more comprehensive instruction, specifically addressing the possibility the comments misinformed the jury on the burden of proof. The judge complied, stating:

One thing that the prosecutor alluded to was about whether or not the defendant is here seeking a favor. I don't know that that is an actual proper comment. Nobody's here seeking any favors from anybody, okay? We're here in a search for the truth. We're here

to put the [S]tate to their burden of proof, to prove the charges beyond a reasonable doubt and then we're here to tie in the facts as you find them to be, to the law as I instruct you to arrive at a fair and just verdict. Okay? We're not here to give anybody any favors or any passes and remember because of that there might be insinuation that the defense has to come forward and say something about a favor. That's not what this is about. All right, so that comment you should disregard from the prosecutor. Nobody's seeking any favors, all right? As the prosecutor alluded to at the end of his summation we're here seeking justice, okay? So keep that in mind.

A.

The guarantee of a fair trial before an impartial jury, see U.S. Const. amends. VI, XIV; N.J. Const. art. 1, ¶ 10, "includes the right to have the jury decide the case based solely on the evidence presented at trial, free from the taint of outside influences and extraneous matters." State v. R.D., 169 N.J. 551, 557 (2001) (citing State v. Bey, 112 N.J. 45, 75 (1998)). Indeed, "securing and preservation of an impartial jury goes to the very essence of a fair trial." Bey, supra, 112 N.J. at 75 (quoting State v. Williams, 93 N.J. 39, 60 (1983)).

A prosecutor has great leeway in his or her opening comments, and he or she is allowed to be forceful. See State v. Wakefield, 190 N.J. 397, 443 (2007) (quoting State v. DiFrisco, 137 N.J. 434, 474 (1994)), cert. denied, 552 U.S. 1146, 128 S. Ct. 1074, 169 L. Ed. 2d 817 (2008). During an opening statement, a prosecutor may

reference facts she or "he intends in good faith to prove by competent evidence." Id. at 442 (quoting State v. Hipplewith, 33 N.J. 300, 309 (1960)).

Name calling, such as labeling defendant a "coward," "liar," or "jackal" has been found untoward or derogatory. State v. Pennington, 119 N.J. 547, 577-78 (1990). Moreover, "to employ degrading epithets such as '[a] cancer,' and 'parasite upon society,' 'animal,' 'butcher boy,' 'young punk,' 'hood,' 'punk,' and 'bum'" required a new trial because the names squarely placed defendant's character at issue. Ibid. (citations omitted).

In presenting a case to a jury, the State is "not to obtain convictions but to see that justice is done." State v. Ramseur, 106 N.J. 123, 320 (1987); see also Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 633, 79 L. Ed. 1314, 1321 (1935) ("[A prosecutor] may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."). The prosecutor may not impassion a jury or incite a verdict based on emotions, but may comment on the evidence to be presented. State v. Black, 380 N.J. Super. 581, 594-95 (App. Div. 2005), certif. denied, 186 N.J. 244 (2006).

A similar standard guides the State's presentation in summation.

> Prosecutors are expected to make a vigorous and forceful closing argument to the jury, and are afforded considerable leeway in that endeavor. Nevertheless, there is a fine line that separates forceful from impermissible closing argument. Thus, a prosecutor must refrain from improper methods that result in wrongful conviction, and is obligated to use legitimate means to bring about a just conviction.
>
> [State v. Ingram, 196 N.J. 23, 43 (2006) (quoting State v. Jenewicz, 193 N.J. 440, 471 (2008)).]

In our review of a prosecutor's statements, we evaluate the alleged improper comments to determine "the severity of [any] misconduct and its prejudicial effect on the defendant's right to a fair trial . . . ." Wakefield, supra, 190 N.J. at 437. "[P]rosecutorial misconduct is not grounds for reversal of a criminal conviction unless the conduct was so egregious as to deprive defendant of a fair trial." Ibid. Claimed errors are not considered in isolation, but viewed in the context of the entire trial. State v. Negron, 355 N.J. Super. 556, 576 (App. Div. 2002). Thus, to warrant reversal, the remarks must be "clearly and unmistakably improper" and "substantially prejudice [a] defendant's fundamental right to have a jury fairly evaluate the

merits of his [or her] defense." State v. Papasavvas, 163 N.J. 565, 625 (2000); see also Ingram, supra, 196 N.J. at 43.

B.

Defendant argues the prosecutor's oblique reference to her as the wolf in "Little Red Riding Hood," rises to the use of "degrading and dehumanizing epithets." She further urges the curative instruction insufficiently diminished the prejudice caused by opening comments equating defendant to "the wolf."

We recognize the prosecutor explained in the referenced opening remarks the fable metaphor was illustrative and designed to focus the jurors' attention on examining the facts in evidence. Notwithstanding the unnecessary comment, we reject defendant's insistence the prosecutor's inappropriate references amount to a prejudicial personal insult or degrading epithet designed to attack defendant's character mandating reversal.

In Wakefield, the prosecutor compared the defendant to a "wolf taking the lives of . . . two helpless sheep." Wakefield, supra, 190 N.J. at 466. The Supreme Court rejected the defendant's claim of prosecutorial misconduct, noting the use of a "single metaphor . . . simply does not rise to the level where defendant's right to a fair trial is implicated." Id. at 467.

Here, multiple mentions of the wolf were made. The State's main point — that things may not be as they first appear — was

19

appropriate and easily communicated by referring to the story, without specific mention of the fairytale's characters. Frankly, if there is a need to explain comments, as occurred here when the prosecutor said, "I am not trying to say defendant is a wolf," such statements are best left unsaid. See State v. Williams, 113 N.J. 393, 456 (1988) (cautioning prosecuting attorneys against derogatory name-calling).

Nevertheless, we cannot agree the prosecutor's misstep was so "egregious as to deprive defendant of a fair trial" or led the jury to an unjust verdict. Wakefield, supra, 190 N.J. at 437. Not only did the prosecutor not state defendant was the wolf, he openly disavowed any negative reference intended by these remarks and clearly explained the point of the reference was the moral of the tale. Further, the judge's curative instruction was satisfactory and blunted the jury's possible reliance upon these comments. See State v. Vallejo, 198 N.J. 122, 134 (2009) (requiring curative instructions to be "firm, clear, and accomplished without delay").

After considering the whole of the record, we conclude the State's opening comments did not "substantially prejudice defendant's fundamental right to have a jury fairly evaluate the merits of h[er] defense." Papasavvas, supra, 163 N.J. at 625.

Turning to the State's summation, defendant argues, "[I]n imploring the jury not to do defendant a 'favor' by issuing an acquittal, the prosecutor violated the fundamental rule governing jury deliberations," implying the jury would fail in fulfilling its duty were a guilty verdict not returned. She also suggests the comments confused the jury as to the burden of proof. See State v. Buscham, 360 N.J. Super. 346, 365 (App. Div. 2003) (stating a jury must "determine whether the State ha[s] proven its case against defendant beyond a reasonable doubt."). Defendant also claims the judge's curative instructions were flawed and only reinforced the prosecutor's impropriety. We remain unpersuaded by these arguments.

"Warnings to a jury about not doing its job is considered to be among the most egregious forms of prosecutorial misconduct." State v. Acker, 265 N.J. Super. 351, 357 (App. Div. 1993) (quoting State v. Knight, 63 N.J. 187, 193 (1973)). In Acker, the Appellate Division reversed a conviction following the prosecutor's assertion the jury must give the child victims justice, noting: "The clear import was that unless the jury convicted defendant, the jurors would violate their oaths." Id. at 356-57. We cannot agree the State's comments suffer from the same defect.

More important, at defendant's request, the trial judge issued detailed instruction to set the jury on course, allaying

21

any possible prejudice caused by the remarks. The judge specifically addressed the State's burden of proof, told the jury the statements were not evidence, and reinforced the jury's role as an impartial arbiter of the facts, as found from evidence. "One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions." State v. Burns, 192 N.J. 312, 335 (2007) (citing State v. Nelson, 155 N.J. 487, 526 (1998), cert. denied, 525 U.S. 1114, 119 S. Ct. 890, 142 L. Ed. 2d 788 (1999)).

Finally, when considering "the claimed error . . . in the context of the entire trial," Negron, supra, 355 N.J. Super. at 576, we reject any suggestion the jury was misled and reached an improper verdict. In short, we cannot conclude the remarks had "a palpable impact." State v. Roach, 146 N.J. 208, 219, cert. denied, 519 U.S. 1021, 117 S. Ct. 540, 136 L. Ed. 2d 424 (1996). These challenges do not require defendant's conviction be set aside.

III.

During pre-trial motions, the trial judge reviewed defendant's two 1996 convictions, one fourth-degree conviction for theft by illegal retention, N.J.S.A. 2C:20-9, and the second, a federal conviction for bank fraud. Following argument, the trial judge concluded these convictions, in a sanitized form, were proper

22

for impeachment purposes if defendant testified in her own defense. In his findings, he noted Daniel was killed in 2007 and found "the totality of the circumstances" resulting from defendant's conduct delayed prosecution and trial.

Defendant argues the judge erred by finding the relevant date for determining remoteness of a conviction was the date of the alleged offense, not when trial commenced. Also, defendant challenges the determination of admissibility, arguing the judge failed to balance the probative value of the evidence against the prejudicial effect required by N.J.R.E. 609.

The State contends there is no prejudice because defendant never took the stand, likely because her custodial statement detailing her conduct in killing Daniel would be admissible. We dispel this suggestion as irrelevant to whether the prior convictions were properly evaluated and found admissible. Our Supreme Court has held "a defendant need not testify at trial to obtain appellate review of a trial court's ruling that the defendant's convictions may be used for impeachment purposes." State v. Whitehead, 104 N.J. 353, 361-62 (1986). We turn to consideration of defendant's argument.

The decision as to whether a prior conviction may be admitted "rests within the sound discretion of the trial judge." State v. Sands, 76 N.J. 127, 144 (1978). "[A] trial court's evidentiary

23

rulings are 'entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. Brown, 170 N.J. 138, 147 (2000) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)); see also State v. Buda, 195 N.J. 278, 294 (2008) ("Trial court evidentiary determinations are subject to limited appellate scrutiny, as they are reviewed under the abuse of discretion standard.").

Directly related to remoteness, N.J.R.E. 609(b)(1) states: "[i]f, on the date the trial begins, more than ten years have passed since the witness's conviction for a crime . . . evidence of the conviction is admissible only if the court determines that its probative value outweighs its prejudicial effect . . . ." Therefore, a judge must consider the date of the prior conviction and the date of the current trial.

The State concedes the trial judge erred by considering the date of Daniel's death, rather than the date of defendant's trial. However, even using the date of the murder, 2007, the prior convictions were entered more than ten years earlier.

A conviction falling outside the defined ten-year period may, nevertheless, be admitted to attack a defendant's credibility, if the probative value outweighs any prejudicial effect. N.J.R.E. 609(b)(1). A judge is guided by several considerations, not simply

24

the remoteness of the offense.  Sands, supra, 76 N.J. at 144-45.

These consideration were discussed by the Court in Sands:

> The key to exclusion is remoteness. Remoteness cannot ordinarily be determined by the passage of time alone. The nature of the convictions will probably be a significant factor. Serious crimes, including those involving lack of veracity, dishonesty or fraud, should be considered as having a weightier effect than, for example, a conviction of death by reckless driving. In other words, a lapse of the same time period might justify exclusion of evidence of one conviction, and not another. The trial court must balance the lapse of time and the nature of the crime to determine whether the relevance with respect to credibility outweighs the prejudicial effect to the defendant. Moreover, it is appropriate for the trial court in exercising its discretion to consider intervening convictions between the past conviction and the crime for which the defendant is being tried. When a defendant has an extensive prior criminal record, indicating that he has contempt for the bounds of behavior placed on all citizens, his burden should be a heavy one in attempting to exclude all such evidence. A jury has the right to weigh whether one who repeatedly refuses to comply with society's rules is more likely to ignore the oath requiring veracity on the witness stand than a law abiding citizen. If a person has been convicted of a series of crimes through the years, then conviction of the earliest crime, although committed many years before, as well as intervening convictions, should be admissible.
>
> [Sands, supra, 76 N.J. at 144-45.]

A-4590-14T2

The Court later adopted these factors in the 1993 revision of our evidence rules. State v. Harris, 209 N.J. 431, 442 (2012). In evaluating the admissibility of prior convictions that are more than ten years old, the court must apply N.J.R.E. 609(b)(1), which provides:

> In determining whether the evidence of a conviction is admissible under Section (b)(1) of this rule, the court may consider:
>
> (i) whether there are intervening convictions for crimes or offenses, and if so, the number, nature, and seriousness of those crimes or offenses,
>
> (ii) whether the conviction involved a crime of dishonestly, lack of veracity, or fraud,
>
> (iii) how remote the conviction is in time,
>
> (iv) the seriousness of the crime.

Here, although elaboration of the specific findings made under N.J.R.E. 609(b)(1) would have aided our review, we are able to affirm the determination as the record contains sufficient reasons to support the use of defendant's 1996 convictions.

The past criminal convictions both involved conduct evincing dishonesty, lack of veracity, or fraud. Such prior crimes may be given greater weight when assessing probative value. Sands, supra, 76 N.J. at 144. Moreover, this factor of dishonesty strongly outweighs remoteness. Ibid. Second, in weighing the totality of all circumstances, the trial judge considered defendant's efforts,

26

which increased the length of time it took police to discover Daniel's remains. The judge's statements, although inartful, conveyed his evaluation of the nature of dishonesty attached to defendant's prior convictions and the State's evidence of defendant's efforts to conceal Daniel's death. Those considerations, coupled with the totality of the circumstances, warranted introduction of the past convictions, as sanitized to challenge the credibility of defendant's offered testimony.

IV.

Finally, defendant challenges her sentence. Here, imposing a fifty-five year term of imprisonment, the judge found five applicable aggravating factors: (1) the nature and circumstances of the offense, defendant's role in the crime, and that it was committed in an especially heinous, cruel, or depraved manner, N.J.S.A. 2C:44-1(a)(1); (2) the gravity and seriousness of harm inflicted upon the victim, including whether or not the defendant knew or reasonably should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to advanced age, ill-health, or extreme youth, or was for any other reason substantially incapable of exercising normal physical or mental power of resistance, N.J.S.A. 2C:44-1(a)(2); (3) the risk of re-offense, N.J.S.A. 2C:44-1(a)(3); (4) the nature and extent of the defendant's prior criminal record, N.J.S.A. 2C:44-1(a)(6);

27

and (5) the need for deterrence, N.J.S.A. 2C:44-1(a)(9). The judge rejected mitigation factors proposed by defendant, finding none were warranted. N.J.S.A. 2C:44-1(b).

Defendant urges the judge erred in giving aggravating factor six strong weight and by rejecting application of mitigating factor seven, which she states applied because she led a law-abiding life for a substantial period of time before the commission of the present offense, N.J.S.A. 2C:44-1(b)(7). We reject defendant's arguments as lacking merit. R. 2:11-3(e)(2). We add these brief comments.

Our review is limited to whether the sentence imposed is supported by substantial credible evidence in the record. State v. Roth, 95 N.J. 334, 363-65 (1984). In order to warrant reversal, a sentencing judge's decision must be so wide of the mark as to "shock the judicial conscience." Ibid.

We do not agree defendant's prior convictions should be accorded little weight. The judge, in the context of applying aggravating factor six, provided these remarks when he applied aggravating factor three:

> [D]efendant has a prior criminal record, being convicted twice in the mid-1990's for theft by deception and bank fraud. One must remember that a part and parcel of this murder is in the planning and aftermath was obtaining this bogus divorce and obtaining all the property of the victim for monetary purposes.

28

See State v. T.C., 347 N.J. Super. 219, 244 (App. Div. 2002), certif. denied, 177 N.J. 222 (2003) (holding support exists for applying aggravating factor six even when a defendant's prior record involved less serious criminal offenses).

Regarding application of mitigating factor seven, it must be shown "the defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time . . . ." N.J.S.A. 2C:44-1(b)(7). Defendant suggests her last conviction occurred in 1996, nineteen years prior to the murder conviction. While technically true, this ignores the facts previously discussed, including the date of the murder and defendant's conduct to hide the body, which significantly delayed bringing her to trial. If one considered the date defendant was released from prison for her last crime and the date she killed her husband, only eight years elapsed. That time period does not support the position defendant led a law abiding life for a significant period of time.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4590-14T2